# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

EILEEN M. PEDERSEN,

        Plaintiff,

    v.                               Case No. 06-C-75

UNION LABOR LIFE INSURANCE COMPANY,

        Defendant.

---

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Eileen Pedersen (hereafter "Eileen") brought this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, alleging that Defendant Union Labor Life Insurance Company ("ULLIC") wrongfully denied benefits due to her as beneficiary of her sister-in-law's accidental death policy. Both parties have moved for summary judgment. I conclude on the basis of the undisputed facts before me that the death was not accidental within the meaning of the policy. ULLIC's motion will be granted, and plaintiff's, denied.

## BACKGROUND

Cheryl Pedersen (hereafter "Cheryl"), plaintiff's sister-in-law, was insured in the amount of $150,000 under a group certificate issued by ULLIC.[1] Cheryl was eligible for coverage under

---

[1] Cheryl initially enrolled in the plan at a benefit level of $100,000, and on September 24, 2002, increased her benefit to $150,000.

the group certificate because she was a member in good standing of the Paper, Allied Industrial, Chemical & Energy Workers International Union ("PACE"), which established and maintained a plan of accidental death and dismemberment insurance for the benefit of its members. It is undisputed that the policy was in full force when Cheryl died on March 16, 2004. She was single, and lived with her brother and sister-in-law in Green Bay.

Prior to her death, Cheryl suffered from a number of illnesses and serious conditions. She was diagnosed with frontotemporal dementia during an admission to the Mayo Clinic in February 2002. Originally known as Pick's Disease, frontotemporal dementia is a clinical syndrome associated with shrinking of the frontal and temporal anterior lobes of the brain. Her personal physician, Dr. John R. Stamm, characterized her diagnosis as Pick's Disease with psychotic features, and observed that her dementia had been progressing in the months prior to her death. (Pl.'s Br., Ex. I, Progress Notes of Dr. Stamm at 2-3.) In addition to being morbidly obese, Cheryl suffered from anxiety and agitation, for which she was receiving prescription medication from Dr. Stamm. She also had difficulty maintaining her airway due to the accumulation of saliva. According to Eileen, Cheryl's anxiety made it more difficult for her to keep her airway free of excess saliva. As a result, Cheryl slept in a recliner. Shortly before her death, however, her family purchased for her a hospital bed on the advice of Dr. Schmitz, another of Cheryl's personal physicians.

Cheryl died in the hospital bed the first night she slept in it. She was discovered in the early morning hours by Eileen, who had arisen to give Cheryl anxiety medications as part of her usual care-giving routine. Eileen and her husband, Randy, called 911 for help, and then apparently

2

made some attempt at resuscitation, which resulted in some movement of the body prior to the emergency medical response team's arrival.[2] (Def.'s Br., Ex. I, Bereza Dep. at 27-29.)

Corey Bereza was a member of the emergency medical response team called to the home. Bereza testified that when he arrived at the scene, Cheryl's feet were not entangled in the bed's guard rails. (*Id.* at 29.) He further testified he saw no sign of a struggle with the rails or sheets, and could not recall whether the body was entangled in the sheets. (*Id.* at 29-30.) Bereza completed an external examination report that was later reviewed by medical examiners as part of their assessment. (Pl.'s Br., Ex. H, Klimek Dep. at 8.)

Shortly after the initial response team's arrival, Ronald Cody, a medical examiner investigator, arrived at the home and conducted an investigation surrounding the circumstances of Cheryl's death. In consultation with the Interim Chief Medical Examiner, Alan Klimek, Cody then prepared an investigation report, which both men later signed. It was part of Klimek's duty to reach a conclusion as to the cause of death, which he listed as "probable hypoxia due to aspiration of sputum due to inability to protect airway due to complications of frontal lobe dementia." (Pl.'s Br., Ex. F, Report of Investigation at 4.)

After reviewing the investigation report, the external examination report, and medical records from Cheryl's personal physician, and after conversing with Eileen Pedersen, Klimek prepared and executed a Certificate of Death, dated March 18, 2004, which listed the cause of death as the report had, minus the qualifier "probable" and the manner of death as "natural." (Pl.'s Br.,

---

[2] Cheryl's living will apparently stated that she did not want resuscitation efforts, but there is evidence the family proceeded with such efforts because emergency response personnel instructed them over the phone to do so. (*See* Def.'s Br., Ex. I, Bereza Dep. at 27.) However, there is also evidence that the family neither made such efforts nor moved the body. (Pl.'s Br., Ex. F, Report of Investigation at 2.)

3

Ex. C, Death Certificate at 1.) In the certificate, Klimek also listed obesity as a significant condition contributing to death. (*Id.*)

After Klimek completed the death certificate, Eileen expressed to Klimek, through several lengthy conversations, her concern that important details surrounding Cheryl's death were not reflected in the death certificate. (Pl.'s Br., Ex. H, Klimek Dep. at 15, 35-36.) Eileen informed Klimek of Cheryl's anxiety in greater detail and told him how Cheryl typically reacted to anxiety when bedridden; she also pointed to signs that Cheryl had been struggling with the sheets and guard rails and that the body had been moved. (*Id.* at 16-19.) Klimek contacted rescue personnel and learned that the body had been moved and that there were signs Cheryl had been struggling with the sheets and guard rails.[3] (*Id.* at 18-19.) Klimek also discussed the matter with Dr. Schmitz, and noted that the toxicology report indicated that Cheryl's anti-anxiety medication had effectively disappeared from her system. (*Id.* at 40-41.) After reviewing this additional information, Klimek prepared an addendum to the report of investigation, in which he changed the probable cause of death to "probable lethal arrhythmia due to hypoxia due to inadequate respirations due to hysteria, with other significant conditions of obesity, dementia and depletion of anti-anxiety medications." (Pl.'s Br., Ex. G, Addendum to Report of Investigation at 2.) Klimek also amended the death certificate, changing the manner of death from "natural" to "accident." (Klimek Dep. at 20-21; Pl's Br., Ex. C, Death Certificate.)

Eileen submitted a claim to ULLIC as the named beneficiary of Cheryl's accidental death policy. ULLIC determined that no benefits were payable under the terms and provisions of the

---

[3] Klimek testified that the rescue personnel who provided him this information was Bereza, even though Bereza could not recall having had such a conversation with Klimek. (*See* Def.'s Br., Ex. I, Bereza Dep. at 29-30.)

policy. After Eileen, through her counsel, requested reconsideration, ULLIC affirmed its initial determination. This litigation ensued, and both parties have now moved for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the

5

nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiff bears the burden of proof with respect to her underlying claim of entitlement to benefits under the plan. *Ruttenberg v. U.S. Life Ins. Co. in City of New York*, 413 F.3d 652, 663 (7th Cir. 2005). Therefore, plaintiff's burden on summary judgment is rather high, requiring her to produce evidence such that no reasonable trier of fact could rule against her. *Liberty Lobby*, 477 U.S. at 252. ULLIC's burden on its cross-motion for summary judgment, on the other hand, is to show that there is an absence of evidence to support an essential element of plaintiff's case. *Celotex*, 477 U.S. at 325. Plaintiff must respond by making a showing sufficient to establish the existence of the essential element under attack. *Id.* at 322. If plaintiff fails to demonstrate the existence of admissible evidence "sufficient to carry [her] burden of proof at trial," *id.* at 327, ULLIC's motion must be granted.

## ANALYSIS

### 1. Standard of Review

The Supreme Court established in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that judicial review of an ERISA plan administrator's decision to deny benefits is *de novo*, unless the plan vests the administrator with discretion. *Id.* at 115. As both parties agree, the plan here did not vest the administrator with discretion, and so *de novo* review is appropriate. Under *de novo* review, the court is not bound by the administrative record, but instead takes a fresh look at both the administrator's interpretation of the plan and the administrator's factual determinations. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir.

1999); *Ramsey v. Hercules, Inc.*, 77 F.3d 199, 204 (7th Cir. 1996); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098-99 & n.4 (7th Cir. 1994). And where the record before the administrator is inconclusive as to either, the parties are free to present additional evidence. *Forste v. Paul Revere Life & Acc. Ins. Co.*, 2004 WL 3315386, at *10 (S.D. Ind. 2004). It should be noted that in this case neither party has sought to offer additional evidence.

### 2. Applicable Law

ERISA expressly states that "the provisions of this title . . . shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." 29 U.S.C. § 1144(a). The Supreme Court has consistently interpreted this broadly drafted preemption to mean that ERISA fully and unconditionally preempts all state-law claims that relate to employee benefit plans. *Aetna Health, Inc., v. Davila*, 542 U.S. 200 (2004); *Intersoll-Rand, Co. v. McClendon*, 498 U.S. 133 (1990); *Pilot Life Ins. v. Dedaux*, 481 U.S. 41 (1987). Consistent with that expansive interpretation, the Court has concluded that this preemption provision displaces all state laws "within its sphere, even including state laws that are consistent with ERISA's substantive requirements." *Metro. Life Ins. Co. v. Mass,* 471 U.S. 724, 739 (1985). Because plaintiff's claims clearly "relate to" an employee welfare benefit plan, they fall within ERISA's express preemption clause. Accordingly, her claims are governed by ERISA rather than state law.

### 3. "Injury" Under the Policy

The group certificate provides for payment of benefits if the insured dies "due to an accidental injury," but no benefits are paid if the death is "due to sickness." (Def.'s Resp. Br., Ex.

7

A, Group Certificate at 1.)  Of central importance here is the certificate's definition of "injury."

"'INJURY' means bodily injury caused by an accident, *directly and independently of all other causes*. . . . Benefits for Injury are not paid for any loss caused by disease or by bodily or mental illness."  (*Id.* at 2 (italics added).)   In addition to this coverage limitation in the definition of "injury," the group certificate expressly excludes coverage for death caused by "sickness, [or] bodily or mental illness."  (*Id.* at 5.)

ERISA does not define "accident" or the limiting phrase "directly and independently of all other causes," so these are areas where the federal courts must rely upon their power to formulate federal common law principles suitable for the governance of employee benefit plans.  *See Pilot Life Ins. Co.*, 481 U.S. at 56 (noting congressional intent that "a federal common law of rights and obligations under ERISA-regulated plans would develop"); *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1050-51 (7th Cir. 1991).  Federal courts may look to relevant state law approaches regarding insurance contract interpretation as an aid to developing this federal common law, but it is federal common law that controls.  *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir. 1990) (noting that federal courts may look to state law approaches, as states generally have had much more experience in the area of insurance contract interpretation); *Matthews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998) ("The relevant principles of contract interpretation [for ERISA plans] are not those of any particular state's contract law, but rather are a body of federal common law tailored to the policies of ERISA.").  Two federal common law rules of contract interpretation are especially relevant here, namely, that courts are to "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience and to

8

construe ambiguous plan terms strictly in favor of the insured." *Brewer v. Protexall, Inc.*, 50 F.3d 453, 457 (7th Cir. 1995) (internal quotation and citation omitted).

A court's first task in attempting to interpret an ERISA plan is to determine whether the contract language at issue is ambiguous, which means asking whether the language is susceptible to more than one reasonable interpretation. *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001). If a court determines the provision is not ambiguous, then it should simply declare the meaning of the provision, without considering extrinsic evidence or public policy arguments. *Id.*; *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir. 1994).

Central to the instant motion is whether, in an ERISA accidental death policy, language limiting coverage to injury caused "an accident, directly and independently of all other causes" is ambiguous. The Seventh Circuit took up this issue, albeit indirectly, in *Mers v. Marriott Int'l Group Acc. Death and Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998). In that case, a policyholder had died from a heart attack during physical exertion after a blood vessel burst in his brain. *Id.* at 1017. The policy, which fell under ERISA, defined "injury" as "bodily injury caused by an accident . . . and resulting directly and independently of all other causes." *Id.* at 1018. As this limiting language was in the policy but not in the summary plan description ("SPD"), one issue before the court was whether the insurer was estopped by the terms of the SPD from denying coverage for a death having multiple causes. In finding that the insurer was not thus estopped, the court found that the "directly and independently" language in the policy clarified, rather than contradicted, the SPD. *Id.* at 1024. The court's rationale implied that the "directly and independently" language was clear, as no discussion was given to any potential ambiguity in interpreting that language.

9

Other circuits have more squarely interpreted accidental death benefits provisions that limit recovery to injuries caused by accident "directly and independently of all other causes." In the Sixth and Tenth Circuits, such language in an ERISA policy is considered unambiguous and thus precludes recovery unless two criteria are met: (1) the loss results directly from accidental bodily injury; and (2) the loss results independently of all other causes. *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000); *Criss v. Hartford Acc. & Indem. Co.*, No. 91-2092, 1992 WL 113370, at *5-6 (6th Cir. May 28, 1992). The Fourth and Eleventh Circuits, concerned that such a strict interpretation would require the claimant to be in perfect health at the time of injury before his policy would benefit him, have adopted a "middle ground" test under which "a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss."[4] *Adkins v. Reliance Standard Life Ins. Co.*, 917 F.2d 794 (4th Cir. 1990); *Dixon v. Life Ins. Co. of N. Am.*, 389 F.3d 1179, 1184 (11th Cir. 2004). In other words, recovery is barred if a pre-existing condition substantially contributed to the injury.[5]

Seventh Circuit precedent does not clearly indicate which federal common law approach is preferred in this circuit, although the *Mers* decision strongly implies that "directly and

---

[4] The fact that federal circuits have split on how to construe "directly and independently of all other causes" in an accidental death benefits policy does not itself create any meaningful ambiguity (such that the court would then need to consider the parties' reasonable expectations). The Fourth and Eleventh Circuits adopted the middle-ground test on public policy grounds, not because they found such language ambiguous. *Adkins*, 917 F.2d at 797; *Dixon*, 389 F.3d at 1184. The Sixth and Tenth Circuits, as explained above, do not find such language ambiguous.

[5] The Ninth Circuit uses this test as well, but gives effect to the restrictive policy language only if it is conspicuous. *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1136 (9th Cir. 1996). The Ninth Circuit's additional requirement is not relevant here, as plaintiff does not argue that the "directly and independently" language is inconspicuous, only that it is "subtle." (Pl.'s Br. at 10; Reply Br. at 5.)

10

independently of all other causes" is not ambiguous. However, under either approach, plaintiff loses. Using the narrower approach, Cheryl's death cannot be considered accidental unless it resulted (1) directly from accidental bodily injury and (2) independently of all other causes. Under the latter condition, recovery is precluded if Cheryl's death was even partially due to some other cause. Plaintiff has introduced no evidence to challenge Klimek's testimony that several other causes—namely, Cheryl's dementia, anxiety, obesity, and difficulty clearing her airway—contributed to her death. (Klimek Dep. at 29-30.) Accordingly, her death did not result independently of all other causes, and plaintiff is precluded from recovery.

Under the "middle ground" test, recovery is barred if Cheryl had a pre-existing condition that "substantially contributed" to her death. Klimek testified that but for Cheryl's pre-existing medical conditions, she would not have died or suffered *any* significant injury as a result of becoming entangled in the sheets or guard rails. (*Id.* at 30-32.) Again, this testimony is unrebutted. Thus, Cheryl had several pre-existing conditions that, at a minimum, substantially contributed to her death.

Plaintiff counters with several arguments. First, plaintiff points to Klimek's conclusion in the amended death certificate and the addendum to his investigative report that Cheryl's death was an "accident." However, a medical examiner's determination that death is accidental is not dispositive for purposes of determining whether the death was an "accident" under the plan. *Clark v. Metro. Life Ins. Co.*, 369 F. Supp. 2d 770, 776 (E.D. Va. 2005). Moreover, Klimek stated that the entanglement is more accurately termed an "incident" than an "accident," and that he categorized it as an accident only because the pre-printed death certificate form essentially forced him to select from several less-than-precise options after he concluded he could no longer deem the

11

death "natural." (Klimek Dep. at 20-21.) *E.g., Mullaney v. Aetna U.S. Healthcare*, 103 F. Supp. 2d 486, 491 (D.R.I. 2000) (holding that medical examiner's determination of "accident" does not mean the "accident" was of the kind contemplated by defendant or described in the plan where the medical examiner has only four choices for cause of death: accident, suicide, homicide, and undetected). The fact that Klimek changed the cause of death on the certificate from "natural" to "accident" does not establish the death was accidental for purposes of the plan, especially in light of Klimek's testimony as to why he made the change; nor does it rebut his testimony regarding the cause of Cheryl's death.

Plaintiff's primary arguments rest on applying the incorrect law. Relying on state court cases and pre-ERISA federal court cases, plaintiff argues the "directly and independently" provision does not preclude recovery where an accident is the prime or moving cause, or where an accident sets in motion the chain of events leading to death. Plaintiff skates around what is explicitly in the policy—the provision defining "injury"—and instead bases his arguments on what is *not* in the policy—namely, a provision addressing situations where there are multiple causes of an accidental death or where the insured's illness contributes to the cause of death following the accident. Plaintiff claims that without such provisions, the policy is ambiguous, and so should be construed in favor of the policyholder based on her reasonable expectations. However, plaintiff's arguments overlook the fact that the controlling law here is federal common law that has developed to interpret "directly and independently" language in an accidental death benefit ERISA plan. While federal courts may seek guidance from state law and general contract law principles when formulating federal common law for ERISA, *e.g., Regents of the Univ. of Michigan v. Agency Rent-A-Car*, 122

F.3d 336, 339 (6th Cir.1997), neither state law nor general contract law principles preempt federal common law.

## CONCLUSION

Because the evidence unequivocally establishes that Cheryl's death was not "caused by an accident, directly and independently of all other causes," her death was not accidental within the meaning of the policy. Plaintiff is therefore is not entitled to benefits under ULLIC's policy. Accordingly, plaintiff's motion for summary judgment must be denied, and defendant's motion for summary judgment is granted. The clerk is directed to enter judgment in favor of ULLIC, dismissing plaintiff's claim with prejudice.

**SO ORDERED** this ___29th___ day of November, 2006.

  s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

13